# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOPHIE, INC., | ) Case No.: SA CV 13-01321-DMG (JEMx) |
| Plaintiff, | ) |
| | ) **ORDER RE LIVINGSOCIAL'S** |
| v. | ) **MOTION FOR SUMMARY** |
| | ) **JUDGMENT, MOPHIE'S MOTION** |
| DHARMESH SHAH, et al., | ) **FOR SUMMARY JUDGMENT AS TO** |
| | ) **TRADEMARK, COPYRIGHT, AND** |
| Defendants. | ) **PATENT INFRINGEMENT, SOURCE** |
| | ) **VISTA AND SHAH'S MOTION FOR** |
| | ) **PARTIAL SUMMARY JUDGMENT,** |
| | ) **AND MOPHIE'S MOTION TO** |
| | ) **BIFURCATE** |
| | ) **[131, 132, 153, 160]** |
| | ) **[REDACTED]** |

This matter is before the Court on the parties' respective motions for summary judgment or partial summary judgment and Plaintiff's motion to bifurcate. Having carefully considered the evidentiary record, the parties' written submissions, and oral argument, the Court now renders its decision. For the reasons set forth below, LivingSocial's Motion for Summary Judgment is **GRANTED** in its entirety, mophie's motion for summary judgment is **GRANTED** in part and **DENIED** in part, Source

-1-

Vista's motion for partial summary judgment is **GRANTED** in part and **DENIED** in part, and mophie's motion to bifurcate is **DENIED** as moot.

## I.

## PROCEDURAL HISTORY

On September 9, 2014, Plaintiff mophie, Inc., ("mophie") filed its Fifth Amended Complaint ("FAC") against Defendants LivingSocial, Inc. ("LivingSocial"), Dharmesh Shah A.K.A. David Shah D/B/A Source Vista, and Serve Global, LLC D/B/A SourceVista.com (collectively "Source Vista") alleging (1) trademark infringement pursuant to 15 U.S.C. § 1114; (2) federal unfair competition and false designation of origin pursuant to 15 U.S.C. § 1125(a); (3) trademark dilution pursuant to 15 U.S.C. § 1125(c); (4) California common law trademark infringement; (6) federal trade dress infringement pursuant to 15 U.S.C. § 1125(a); (7) California unfair competition pursuant to Cal. Bus. & Prof. Code § 17200 *et seq.*; (8) copyright infringement under 17 U.S.C. § 501 *et seq.*; (9) and patent infringement under 35 U.S.C. § 271. [Doc. # 123.] On September 22, 2014, LivingSocial, mophie, and Source Vista filed cross-motions for summary judgment or partial summary judgment. [Doc. ## 131, 132, 153.] mophie moved for summary judgment as to trademark, copyright, and patent infringement claims against both Source Vista and Living Social. Source Vista moved for partial summary judgment as to ownership of a valid copyright and patent infringement, and LivingSocial moved for summary judgment as to all claims against it. *Id.*

On October 3, 2014, LivingSocial filed its opposition to mophie's motion for summary judgment, mophie filed its oppositions to Source Vista's motion for partial summary judgment and LivingSocial's motion for summary judgment, and Source Vista filed its opposition to mophie's motion for summary judgment. [Doc. ## 172, 174, 178, 187.] On October 10, 2014, LivingSocial, mophie, and Source Vista filed reply briefs in support of their respective motions. [Doc. ## 226, 234, 235.]

On September 26, 2014, mophie filed a motion to bifurcate Defendants'

-2-

inequitable conduct defense and counterclaim.   [Doc. # 160.]   On October 3, LivingSocial and Source Vista filed oppositions to the motion to bifurcate.  [Doc. ## 163, 165.]  On October 10, 2014, mophie filed a reply in support of the motion to bifurcate. [Doc. # 224.]

# II.

# FACTUAL BACKGROUND[1]

## A.    The Parties

Plaintiff mophie is a designer and manufacturer of mobile accessories, including battery and storage cases, headquartered in California.   *See* Statement of Genuine Disputes of Material Fact in Opposition to Defendants Dharmesh Shah and Serve Global LLC's Motion for Partial Summary Judgment ("mophie GDMF (SV)") at ¶ 1.  [Doc. # 176.]   mophie sells battery charger cases for smartphones and mobile devices, which provide both a protective case and a portable backup battery source that can recharge the smartphone.  FAC at ¶ 10.

Defendant LivingSocial is a company that promotes "Deals" for consumers to obtain discounted services or products through its website.   Statement of Genuine Disputes of Material Fact in Support of Opposition to Defendant LivingSocial, Inc.'s Motion for Judgment as a Matter of Law, or in the Alternative, Summary Judgment ("mophie GDMF (LS)") at ¶ 1.  [Doc. # 180.] [2]

---

[1] As it must on this motion for summary judgment, the Court sets forth the material facts and views all reasonable inferences to be drawn from them in the light most favorable to the non-moving party.  The facts presented are materially uncontroverted, unless otherwise indicated.  In addition, both sides make evidentiary objections.  The Court addresses the objections only where it relies on the evidence as to which objections have been interposed.

[2] mophie disputes this fact, stating that "LivingSocial characterizes itself as a mere promoter of 'deals,' but it is in substance a discount retail seller of goods."  mophie GDMF (LS) at ¶ 1.  It is undisputed that LivingSocial "provides consumers with opportunities to purchase certain products and

Defendant Dharmesh "David" Shah is an individual who has done business as Source Vista.  mophie GDMF (SV) at ¶ 2.

Defendant Source Vista, headquartered in Texas, is a supplier of products to deal sites and online store companies.  *Id*.  Serve Global, a company headquartered in Texas, does business as Source Vista and SourceVista.com and has been a merchant selling products through the LivingSocial marketplace.  *Id*. at ¶¶ 2-3.

## B.    The Juice Pack Products

The mophie juice pack cases are the number one selling battery cases in North America, and have ████ of the U.S. battery market.  Bocan Decl. at ¶¶ 16, 19.  mophie has spent many millions of dollars promoting its juice pack family of battery cases.  Declaration of Paul A. Stewart in Opposition to Defendants' Motion for Summary Judgment ("Stewart Opp. Decl."), Ex. 10 (Doherty Tr.) at 351:2-7.  mophie has sold millions of juice pack products.  *See* LivingSocial, Inc.'s Statement of Genuine Disputes of Material Fact in Opposition to mophie, Inc.'s Motion for Summary Judgement ("LivingSocial GDMF") at ¶ 15 [Doc. # 166]; Defendants' Response to Plaintiff's Statement of Uncontroverted Material Fact and Contentions of Law ("Source Vista GDMF") at ¶ 4 [Doc. # 188].[3]

mophie relies in part on online forums and websites to promote its juice pack smartphone battery case products.  LivingSocial GDMF at ¶ 10; Source Vista GDMF at ¶

---

services . . .  from third-party merchants" (mophie GDMF (LS) at ¶ 3) which LivingSocial refers to as Deals.

[3] Source Vista disputes this fact, stating that "the testimony that Plaintiff has sold millions of 'juice pack' products is irrelevant because the copyrights only apply to 'juice pack plus' and 'juice pack air.'"  Source Vista GDMF at ¶ 4.  Evidence of sales is relevant to secondary meaning for purposes of establishing a valid and protectable trademark, among other issues.  The fact is relevant and not genuinely disputed.

10 [Doc. # 188].  mophie's juice pack plus products are sold through and the products and packaging are displayed on websites such as mophie.com, apple.com, bestbuy.com, and target.com.  LivingSocial GDMF at ¶ 17; Source Vista GDMF at ¶ 6.  mophie's juice pack plus products are sold in most major consumer electronics retail stores, including Apple stores, Best Buy, and Target.  LivingSocial GDMF at ¶ 16; Source Vista GDMF at ¶ 5.

### 1.    Features

mophie's juice pack plus product includes both a hard-shell protective case into which a smartphone fits and an integrated battery source inside the case that can power the smartphone.  FAC at ¶ 10.  Source Vista's juice pack plus phone case includes the same features.  mophie GDMF (SV) at ¶ 7.  Pictures of the two products are shown below:

<u>mophie's Battery Case</u>:              <u>Source Vista's Battery Case</u>:



Declaration of Sheila N. Swaroop in support of Plaintiff mophie's Motion for Summary Judgment ("Swaroop Decl.") at Exs. 16, 20.  [Doc # # 135-20, 135-26.]

### 2.    Packaging

The packaging for mophie's smartphone battery charger cases has the words "mophie juice pack plus" written down the left side of the front of the packaging in all lower-case in a sans-serif font.  *See* Source Vista GDMF at ¶¶ B(17)-(18) [Doc. # 188]. With the exception of the word "mophie," the packaging for Source Vista's battery charger smartphone case has the same words in the same font and position as the mophie

packaging.  *Id*.  The packaging for both the mophie cases and the Source Vista cases show a nearly identical picture of a smartphone phone with a home screen displaying the time 4:11, the date November 11, and a picture representing a fully charged battery.  *Id*.

Pictures of the packaging for the two products are shown below:

mophie's Battery Case Packaging:            Source Vista's Battery Case Packaging:

    

Source Vista GDMF at ¶¶ B(17)-(18).

### 3.    User Manuals

mophie's copyrighted user manual states, among other things:  "Thank you for purchasing the mophie juice pack air™.  You will now be able to travel great distances: be the master of your own destiny, no longer bound by the limitations of your iPhone internal battery.  Let's get Juiced!"  (Source Vista GDMF at ¶ B(7); LivingSocial GDMF at ¶ 18); "The mophie juice pack air extends the battery life of your iPhone for hours and provides a comfortable ergonomic design with the complete protection of a hard shell case." (Source Vista GDMF at ¶ B(9); LivingSocial GDMF at ¶ 20); "How many charge cycles do you get in the juice pack air?  The juice pack air is rechargeable for over 500

cycles[.]   (These are full cycles.   Partial cycles don't count as full.   So, you can charge your juice pack 10% of the way.   10 times before it counts as a complete cycle.)   Don't be afraid to top it off!"  (Source Vista GDMF at ¶ B(13); LivingSocial GDMF at ¶ 24); "Will I always receive double the battery life with my juice pack air?   We cannot guarantee that you will receive double the battery life.   The amount of additional battery you will receive depends on a variety of factors that are different for every user." (Source Vista GDMF at ¶ B(15); LivingSocial GDMF at ¶ 26).

Source Vista's user manual states, among other things:  "Thank you for purchasing the juice pack PLUS.   You will now be able to travel great distances, no longer bound by the limitations of your iPhone internal battery.   Let's get juiced."  (Source Vista GDMF at ¶ B(8)); "The juice pack PLUS extends the battery life of your iPhone for hours and provides a comfortable ergonomic design with the complete protection of a hard shell case."  (*id*. at ¶ B(10))[4]; "How many charge cycles do you get in the juice pack PLUS? The juice pack PLUS is rechargeable for over 500 cycles[.]  (These are full cycles. Partial cycles don't count as full.  So, you can charge your juice pack PLUS 10% of the way 10 times before it counts as a complete cycle).  Don't be afraid to top it off." (*id*. at ¶ B(14))[5]; "Will I always receive double the battery life with my juice pack PLUS?  We cannot guarantee that you will receive double the battery life.   The amount of additional battery you will receive depends on a variety of factors that are different for every user." (*id*. at ¶ B(16)).[6]

------

[4] Source Vista disputes this fact, stating that "the user manual is only reflected in Exhibit 18, not Exhibit 14" (Source Vista GDMF at ¶ B(10)), but does not dispute that this fact accurately reflects the contents of the manual.

[5] Same as n. 4.

[6] Same as n. 4.

### C.    mophie's Trademarks

#### 1.    mophie's Registered Trademarks

mophie has a federal registration for its juice pack plus trademark.  LivingSocial GDMF at ¶ 1; Source Vista GDMF at ¶ 1; Declaration of Sheila N. Swaroop in support of Plaintiff mophie's Motion for Summary Judgment ("Swaroop Decl.") at Ex. 1-3 [Doc. # 279].

In 2011, the United States Patent and Trademark Office ("PTO") rejected mophie's first application for a "juice pack" trademark because the examiner found the mark to be descriptive of the function of the product.  Declaration of Drew H. Sherman in Support of Defendants' Opposition to Plaintiff's Motion for Summary Judgment ("Sherman Decl.") at ¶ 4; Ex. A.  [Doc. # 190.]  mophie subsequently overcame the determination that the mark was merely descriptive and obtained a federal registration for the "juice pack plus" mark without being required by the PTO to submit evidence of secondary meaning. Supplemental Declaration of Sheila N. Swaroop in Support of Motion for Summary Judgment ("Suppl. Swaroop Decl."), Ex. 32 [Doc. # 227-11].   mophie was able to demonstrate that "juice pack" is not descriptive to the satisfaction of the PTO, and mophie's application issued without any disclaimer.  Suppl. Swaroop Decl., Ex. 33 [Doc. # 227-12].

#### 2.    mophie's Unregistered Trademarks

On the packaging of its juice pack cases, mophie includes an image of an iPhone showing the time of 4:11 (the "4:11 lock screen") and the date of Tuesday, November 11. Bocan Opp. Decl. at ¶ 5.  mophie considers the display of this exact time and date on its packaging to be its trademark.  mophie GDMF (SV) at ¶¶ 30-31.  The majority of sales of mophie's juice pack products have included the Tuesday November 11 date on their packaging.  Bocan Opp. Decl. at ¶ 8-9.  Source Vista asserts that mophie has used other dates on its packaging, including March 13 and December 31.  mophie GDMF (SV) at ¶ 32.  mophie disputes this fact, stating that "mophie has consistently used the Tuesday

November 11 date." *Id*. Regardless of which date has been used, the 4:11 time has always been used, and always been the most dominant portion of the trademark. *Id*. The 4:11 Lock Screen is prominently displayed on mophie's social media sites and in numerous magazines featuring mophie and its products such as *People*, *Oprah*, *Money* and *Network World*. Bocan Decl. at ¶ 8.

### 3.   Actual Customer Confusion

LivingSocial's Rule 30(b)(6) witness Gregg Phalen stated in his deposition that there had been "about a dozen cases" in which consumers were confused by the nature of the Source Vista product they received, "suggesting it was a mophie copy or knock-off." Swaroop Decl. Ex. 9 ("Phalen Tr.") at 135:8-21.[7]   Phalen stated that he was not aware of any consumers referring to the Source Visa phone charger specifically as a "juice pack product." *Id*. at 135:1-6.

---

[7] mophie has produced five witnesses who have stated in declarations that they were confused as to the source of the battery cases they bought from LivingSocial.  mophie SUF at ¶ 8; Declaration of Bruce Jaffe ("Jaffe Decl") at ¶ 2; Declaration of Steven Neufeld ("Neufeld Decl.") at ¶ 2; Declaration of Kelly Gray at ¶ 2 ("Gray Decl."); Declaration of Tim Starkey ("Starkey Decl.") at ¶ 2; Declaration of Fran Seward at ¶ 2 ("Seward Decl.").  [Doc. ## 138, 139, 140, 141, 142.]

Source Vista asserts that mophie did not disclose the names of the allegedly confused customers through a supplemental Rule 26 report or the production of the declarations prior to the close of fact discovery, and did not provide information regarding customers with relevant information in responses to interrogatories before fact discovery closed.  Source Vista MSJ Opp. at 7-8; Sherman Decl. at ¶¶ 7-8, Ex. C (February 6, 2014 Initial Disclosures) (mophie lists "[o]ne or more of Defendants' customers" re: "[k]nowledge of actual confusion related to Defendants' promotion and/or sale of infringing products" as "Unknown at this time"), Ex. D (October 3, 2014 Responses to Interrogatories) (no names of any customers with knowledge of actual confusion).  [Doc. # 190].  These witnesses' declarations are therefore inadmissible because witnesses were not appropriately disclosed to Defendants during the discovery period. Fed. R. Civ. P. 37(c)(1) (If a party fails to provide information or identify a witness during the discovery period, the party may not use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was "substantially justified" or is "harmless.").  The fact that mophie did not know the names of any such witnesses before the end of fact discovery is not adequate to demonstrate harmlessness or substantial justification for failure to disclose.

### D.     mophie's Copyrights

In 2011 and 2012, the Copyright Office issued Copyright Registration Numbers VA 1-780-916 and VA 1-814-020 ("mophie's Copyright Registrations") for mophie's product packaging and user manuals for its juice pack products.  Source Vista GDMF at ¶ B(1); Swaroop Decl., Exs. 3-6.  mophie's copyrighted works were not published until November 23, 2010 and January 19, 2012.  *Id*. at ¶ B(2).  mophie's Copyright Registrations for these works were issued before five years after the date of first publication.  *Id*. at ¶ B(3).  mophie's asserted copyrighted packaging and user manuals are included with the battery cases sold by mophie.  *Id*. at ¶ B(4).

### E.     LivingSocial

#### 1.     How LivingSocial Works

To participate in LivingSocial Deals, consumers become "members" of LivingSocial, after agreeing to its terms and conditions.  mophie GDMF (LS) at ¶ 2.  These terms and conditions state that:

> LivingSocial provides consumers with opportunities to purchase certain products and services . . . from third-party merchants . . . using a time-limited promotional voucher exchangeable for Merchant goods and services (a "Voucher").  The promotion of each Deal works as a form of advertisement for the Merchant by LivingSocial.

mophie GDMF (LS) at ¶¶ 3, 20; Phalen Decl. at ¶ 7, Ex. 1.

After a Deal is approved, production and editorial teams prepare the promotion for distribution.  mophie GDMF (LS) at ¶ 6.  The final Deal content is then reviewed and approved by the merchant, who is responsible under LivingSocial's merchant agreement for ensuring that promoted products do not infringe proprietary rights.  *Id*. at ¶7; Phalen Decl. at ¶ 9, Ex. 2 at § 6(b).  Customers who wish to obtain a promoted product or service from LivingSocial obtain a voucher, and then navigate to a redemption page on the merchant's website where they input a voucher code, shipping information, and payment

for shipping.  mophie GDMF (LS) at ¶ 11.

### 2.      LivingSocial and Source Vista's Relationship

In June of 2013, Shanna Hamilton worked with Source Vista to promote its products.  mophie GDMF (LS) at ¶ 14.  Hamilton had no knowledge of mophie or any of its intellectual property at that time.  *Id*. at ¶ 15.  On June 26, 2013, Living Social and Source Vista executed a merchant service agreement whereby LivingSocial agreed to market and sell vouchers that could be used to purchase Source Vista's "iPhone 5 Charger Case."  *Id*. at ¶ 18.  Under the merchant service agreement, Source Vista alone was responsible for shipping cases to persons redeeming vouchers.  *Id*. at ¶ 19. LivingSocial states in its terms and conditions that:

> The promotion of each Deal works as a form of advertisement for the Merchant by LivingSocial . . . The Merchant . . . is solely responsible for redeeming the Voucher . . . LivingSocial is solely the marketer of the Merchant's goods or services.

*Id*. at ¶ 21.

Source Vista represented in the merchant service agreement that its cases did not infringe or misappropriate any "copyright, trademark, right of publicity, moral right, trade secret, or other proprietary right."  *Id*. at ¶ 22.  LivingSocial did not conduct any additional investigation into any intellectual property rights associated with mophie's juice pack cases or otherwise ask Source Vista whether it had conducted any investigation of any intellectual property rights associated with mophie's juice pack cases.  *Id*. at ¶¶ 89-90.

LivingSocial began promoting Source Vista's iPhone 5 charger case on July 25, 2013.  *Id*. at ¶ 23.  The promotion for the Source Vista phone cases on LivingSocial's website did not display the "Juice Pack Plus," "Circular Pattern," or "4:11 Lock Screen" marks.  *See* FAC, Ex. 21.  The promotion did not display any pictures of the packaging for the phone cases.  *Id*.

The promotion listed Source Vista's name above the "Buy now!" button which

-11-

consumers clicked to purchase a voucher. *Id*. at ¶ 24. When a consumer clicked this button and purchased the Deal through the LivingSocial website, she paid $21 to LivingSocial. Phalen Tr. at 37:18-22 ("Q: Now, when a consumer decides to purchase a deal through the LivingSocial web site, it's my understanding that they pay LivingSocial, not the merchant; is that correct? A: That is correct."). Customers who clicked the "Buy now!" button were directed to the Source Vista website, where they entered the voucher number, provided a shipping address, selected a color, and provided payment for shipping. *Id*. at ¶ 31.[8]

LivingSocial never took custody of the charger cases, never took title to the charger cases, and never shipped any of the cases. *Id*. at ¶ 33.[9] LivingSocial did not have the ability to force Source Vista to ship or stop shipping its charger cases. *Id*. at ¶ 34.[10]

LivingSocial asserts that the voucher purchased could be used to purchase a Source Vista iPhone 5 charger case or could be used as "paid value" to buy any other product on

---

[8] mophie disputes this fact stating that "[c]onsumers who purchased the accusing charging cases were directed to enter an identification number (the so-called 'voucher' number) on Source Vista's website. However, this was not in substance the redemption of a voucher. It was a ministerial task to complete a purchase." mophie GDMF (LS) at ¶ 31. This does not create a genuine dispute as to the fact that customers were directed to Source Vista's website to enter the requested information after clicking the "Buy it now!" button.

[9] mophie disputes this fact because LivingSocial took possession of a single Source Vista charger case for purposes of ensuring quality and functionality. mophie GDMF (LS) at ¶ 33. There is no evidence, however, that LivingSocial took possession of any of the cases that were sold and shipped to customers.

[10] mophie disputes this fact by stating that "[w]hen Source Vista failed to promptly ship counterfeit cases purchased through LivingSocial, LivingSocial took steps to ensure prompt shipment. . . . If those steps had proven unsuccessful, LivingSocial could have filed suit against Source Vista for breach of the merchant services agreement." mophie GDMF (LS) at ¶ 34. The fact that LivingSocial could have attempted to bring a lawsuit against Source Vista for breach of contract does not create a genuine dispute as to the fact that LivingSocial did not have the legal or practical ability to force Source Vista to stop shipping its charger cases under the Merchant Agreement or otherwise.

-12-

1
2
3
4
5

Source Vista's website after the charger case promotion ended.  *Id*. at ¶ 27. [11]  All of the sales of Source Vista's phone cases have been through the LivingSocial promotion. Declaration of Paul A. Stewart in Opposition to Motion for Partial Summary Judgment as to ownership of a valid copyright and Patent Infringement ("Stewart Opp. Decl."), Ex. 1 at 118:5-14.  [Doc. # 182.]

6
7
8
9

LivingSocial's Fed. R. Civ. P. 30(b)(6) witness Gregg Phalen stated at his deposition that there had been "about a dozen cases" in which consumers were confused by the nature of the Source Vista product they received, "suggesting it was a mophie copy or knock-off."  Swaroop Decl. Ex. 9 ("Phalen Tr.") at 135:8-21.

10
11
12
13
14
15
16
17

mophie served its first complaint against LivingSocial on August 29, 2013.  *Id*. at ¶ 37.  By 9:33 a.m. on August 30, 2013, LivingSocial stopped promoting Source Vista's charging case on its website.  *Id*. at ¶ 39.  LivingSocial processed the payment for three vouchers for the infringing product and issued three refunds after it received notice of the alleged infringement on August 30, 2013 (the latest refunds were issued on October 12, 2013).  Stewart Opp. Decl., Ex. 30 (showing one refund on September 13, 2013 and two refunds on October 12, 2013) and Ex. 44 (Revenue & Promo Detail) [Doc. # 277 at 168].

18

### 3.    LivingSocial and mophie's Relationship

19
20

Between March and June of 2013, LivingSocial salesman Ryan Beebe explored the possibility of putting together a Deal with mophie.  mophie GDMF (LS) at ¶ 10; *see*

21
22
23

24
25
26
27
28

[11] mophie disputes this fact by stating that "Customers were required to enter an identification number or voucher number to contemplate their purchase.  But consumers did not use vouchers or voucher numbers as 'payment' for anything.  The only payment made by a consumer was the $21 paid to LivingSocial.  In addition, there is no evidence that any customer ever received anything other than a counterfeit battery case for his or her $21."  mophie GDMF (LS) at ¶ 27.  mophie essentially disputes the characterization of the voucher as "payment," not the fact that the voucher could be exchanged for a Source Vista phone charger.  There is no genuine dispute as to the fact that the voucher could potentially be used as payment for other products on Source Vista's website.

1  Wytsma Decl., Ex. 13.   [Doc. # 293.][12]   The emails he exchanged with mophie

2  representatives did not address issues of intellectual property, or the existence of any

3  trademarks, copyrights, or patents.  mophie GDMF (LS) at ¶ 11; Wytsma Decl., Ex. 13.

4          In April of 2013, Beebe sent an email to Elizabeth Hinkle, senior counsel in the

5  LivingSocial legal department.     Declaration of Elizabeth Hinkle in Support of

6  LivingSocial's Motion for Judgment as a Matter of Law or, in the Alternative, Summary

7  Judgment ("Hinkle Decl.") at ¶ 3.  [Doc. # 144.]  The email forwarded documents Beebe

8  had received from mophie, including a "New Customer Application," an "Approved

9  Retailer Agreement," "Minimum Advertised Price Policy," and "Mutual Nondisclosure

10 Agreement."  *Id.*  None of these documents made any mention of the products that

11 LivingSocial might promote on behalf of mophie.  *Id.*  The Approved Retailer Agreement

12 states that "mophie has developed and continues to develop lines of products used to

13 recharge or extend the life of batteries used in handheld devices which it sells under the

14 trademark 'mophie juice pack' and other trademarks owned by mophie."  Wytsma Decl.,

15 Ex. 13.  LivingSocial did not ultimately sign the Retailer Agreement because it conflicted

16 with the terms of its standard agreement for merchant partners.   Hinkle Decl. at ¶ 4.

17 Hinkle deleted the Approved Retailer Agreement and the Minimum Advertised price

18 policy, and did not closely review the provisions of the Approved Retailer Agreement.

19 *Id.* at ¶ 5; mophie GDMF (LS) at ¶ 12.  She did not discuss any of the terms of the

20 agreement with anyone else at LivingSocial because it was clear to her that they were not

21 going to do the Deal.  Hinkle Decl. at ¶ 5.  Hinkle did not have any knowledge of the

22 patents, trademarks, trade dress, or copyrights at issue before the lawsuit was served on

---

[12] mophie objects to the admission of the emails from Ed Valenzuela, an employee of LivingSocial, contained in Exhibit 13, as inadmissible hearsay.  The emails are introduced to show the existence of communications between employees of the two companies, not for the truth of the statements made by those employees.  The objection is overruled.

LivingSocial on April 29, 2013.  *Id*. at ¶ 7.  Hinkle had no knowledge of or involvement in the Source Vista promotion.  *Id* at ¶ 8; mophie GDMF (LS) at ¶ 13.

Some LivingSocial employees, including Nick DiPietro, Lauren Jennings, and Matthew Mulqueen, tracked competitor activities on a spreadsheet, including a Groupon sale of a mophie juice pack battery case in July 2013.  Stewart Decl., Ex. 21.  [Doc. # 277.]  The spreadsheet tracked many deals, and included more than fifty other deals on the same page as the mophie entry.  *Id*.  DiPietro inspected the package of a Source Vista "juice pack plus" phone case in order to vet the product for the LivingSocial Deal, but gave it to a different LivingSocial employee to test it for functionality.  Stewart Decl., Ex. 28 ("DiPietro Tr.") at 76:8-20.

### F.    The '235 Patent

#### 1.    Recitals

mophie has been granted U.S. Patent No. 8,367,235 ("the '235 patent") for its juice pack battery cases, and has listed the patent on its website since at least February 26, 2013.  Bocan Opp. Decl. at ¶ 22.

Claim 1 of the '235 Patent recites "a bottom portion" comprised of:

> a back plane upon which the back of a housing of the mobile device will be placed against [sic], where the back plane comprises a top edge; a battery cell, enclosed in the bottom portion; a processor, coupled to the battery cell; a bottom sidewall, connected to the back plane at an end opposite of the top edge, that will be positioned against a bottom side edge of the mobile device; an internal interface, on the bottom sidewall, positioned to connect to an interface on the mobile device, and coupled through the process to the battery cell; and an external interface, positioned on an outside bottom side of the bottom portion, coupled through the processor to the battery cell and internal interface.

Source Vista GDMF at ¶ C(19).

Claim 1 also recites "a top portion" comprised of:

-15-

a top side that will be positioned against a top side edge of the mobile device when the top portion is seated against the bottom portion; and an open side end, opposite of the top side, wherein when the top portion is seated against the bottom portion, the top and bottom portions meet at and form a seam which extends across a back of the battery pack, and when the top portion is seated against the bottom portion, a first open-polygon-shaped opening for the bottom portion merges with a second open-polygon-shaped opening for the top portion to form a cavity of the battery pack through which a screen of the mobile device will be visible, the cavity having a closed shape.

*Id.*

Claim 45 of the '235 Patent recites a "battery pack for a mobile device" including:

a first portion comprising:  a back plane against which a back of a housing of the mobile device will be positioned, wherein the back plane comprises a top edge; a battery cell, enclosed in the first portion; a bottom sidewall, connected to the back plane at an end opposite of the top edge, that will be positioned against a bottom side edge of the mobile device; an internal interface, on the bottom sidewall, positioned to connect to an interface on the mobile device, and coupled to the battery cell; and an external interface, positioned on an outside of the first portion, coupled to the battery cell and internal interface; and

a second portion comprising:  a top side that will be positioned against a top side edge of the mobile device when the second portion is seated against the first portion; and

an open side end, opposite of the top side, wherein the second portion slides onto the bottom portion through the open side end, wherein when the second portion is seated against the bottom portion a first open-polygon-shaped opening for the first portion merges with a second open-polygon-shaped opening for the second portion to form a cavity of the battery pack through which a screen of the mobile device will be visible, the cavity having a closed shape.

*Id.* at ¶ C(20).

Source Vista's product is a battery pack for a mobile device with a battery cell enclosed in the bottom portion. *Id*. at ¶ C(21), (22), (25). Source Vista's battery case includes a top portion that includes a top side that will be position[ed] against a top side edge of the mobile device when the top portion is seated against the bottom portion and a first open-polygon-shaped opening for the bottom portion which merges with a second open-polygon-shaped opening for the top portion to form a cavity of the battery pack through which the screen of the mobile device is visible. *Id*. at ¶¶ C(33), (34), (38). The first portion of the Source Vista battery case includes a back surface against which a back of a housing of the mobile device will be positioned, and the back surface includes a top edge. *Id*. at ¶ (41).[13] Within the interior of the bottom portion of the Source Vista case is a battery cell and a circuit board attached to the battery cell through wiring connections. *Id*. at ¶ 7. The circuit board does not attach to a sidewall of the case. *Id*. at ¶ 17. The circuit board does not provide the surface against which the mobile device is placed. *Id*. at ¶ 18.

### 2. The Related Patents' Prosecution Histories

The '235 patent issued from U.S. Patent Application Serial No. 12/357/262, filed on January 21, 2009. mophie GDMF (SV) at ¶ 8. U.S. Patent Application Serial No. 12/938,351 ("the '351 App."), was filed on November 2, 2010, as a divisional of the '235 Patent Application. *Id*. at ¶ 10. The '351 App. shares identical specifications and drawings with the '235 patent because the '351 application was filed from the same application that became the '235 patent. *Id*.; *see also* Declaration of David Munson in Support of Defendants' Motion for Partial Summary Judgment ("Munson Decl.") at ¶ 25.

---

[13] Source Vista disputes that the Accused Product has a "back plane" as properly construed, but does not dispute that there is a back surface against which the housing of the mobile device will be positioned, and that the back plane includes a top edge. Source Vista GDMF at ¶ C(41).

1  [Doc. # 154.]  The '351 App. is still pending and has not yet been issued as a patent.
2  Declaration of Scott McPherson in Support of Motion for Partial Summary Judgment as
3  to Ownership of a Valid Copyright and Patent Infringement ("McPherson Decl."), Ex. C
4  ("the '351 App.").  [Doc. # 157-3.]  Both patent applications claimed priority to Provision
5  Patent Application Serial No. 61/021/897 ("the '897 App."), filed on January 18, 2008.
6  mophie DGMF (SV) at ¶ 8.

7      The claimed invention in the '351 Application relates to a battery pack for a
8  mobile device.  '351 App. at Ex. 1 ("Nunally Decl.") at ¶ 18.  Claim 21 of the '351 App
9  is for:

> A battery pack for a mobile device comprising: (i) a bottom
> section comprising: (1) *a back* plane *upon which a back of a*
> *housing of the mobile device will be placed against*, wherein the
> back plane comprises a top edge; (2) a battery cell, enclosed in
> the bottom section; (3) a processor, coupled to the battery cell;
> (4) *a bottom sidewall, connected to the back plane* at an end
> opposite of the top edge, that will be positioned against a bottom
> side edge of the mobile device…

16 *Id.* (emphasis added).

17      During the prosecution of the '351 App, Dr. Patrick Nunally submitted a February
18 24, 2012 declaration ("the Nunally Declaration") in which he stated his opinion that the
19 specifications of the '897 App. provided sufficient "written description" support for the
20 claim limitation "one or more circuit boards."  mophie GDMF (SV) at ¶ 12; Nunally
21 Decl. at ¶ 36.  The declaration states that "[t]he term back plane was known to one skilled
22 in the art specifically in November of 2007, to be 'a circuit board containing sockets into
23 which other circuit boards can be plugged in.'"  mophie GDMF (SV) at ¶ 12; Nunally
24 Decl. at ¶ 35.  "In addition, a backplane is defined in the *McGraw-Hill Dictionary of*
25 *Scientific and Technical Terms* as 'a wiring board, usually constructed as a printed
26 circuit, . . . to provide the required connections between logic, memory, input/output
27 modules, and other printed circuit boards.'"  *Id.*
28

-18-

In response to the Nunally Declaration, the Examiner issued a Detailed Action on October 17, 2011, stating that "[i]n regards to the element of a 'circuit board' it has been noted that there is full support for the element of a circuit board to the earliest filing date." McPherson Decl., Ex. C ("Detailed Action") at ¶ 3.

On November 20, 2013, Dr. John Feland submitted a declaration relating to the '351 App., in connection with patent interference proceedings, stating that the term "back plane" should be given the meaning of a flat surface located on the back side of the device. *Id.* at ¶ 49. A person skilled in the art reviewing the '351 file history would find two different definitions of "back plane" in the expert declarations. *Id.*

### 3.    Expert Opinions

mophie's expert, Dr. Feland, states that, in his opinion, the term "back plane" in the asserted claims of the '235 Patent means a flat surface located at the back of the device. Declaration of John Feland, Ph.D. in Support of Motion for Summary Judgment as to Trademark, Copyright, and Patent Infringement ("Feland Decl."), Ex. 21 ("Feland Report") at ¶ 46. [Doc. # 136.] He explains that the back of the mobile device (which is flat) is intended to be placed against the "back plane" of the case, and that this is what the figures accompanying the patent application show. *Id.* ¶¶ 46-47. He states that:

> construing the term 'back plane' to mean 'a circuit board' or 'a circuit board containing sockets into which other circuit boards can be plugged in' would be contrary to the claims and the specification. Further, it would make no sense for the back of a mobile device to sit against a circuit board or a circuit board with sockets. The patent is directed at a small device used to receive a mobile phone; not a circuit board in a computer configured to receive other circuit boards. In fact, the claim language itself contradicts any notion that the term 'back plane' refers to a circuit board. Claim 1 expressly requires 'a bottom sidewall, connected to the back plane . . .' It would make no sense to connect a structural component like the bottom sidewall to an internal electronic component like a circuit board.

*Id.* at ¶ 48.

-19-

1   Defendants' expert, Dr. David C. Munson, agrees that he "would not expect" to
2   connect a structural external component like the bottom sidewall to an internal electronic
3   component like a circuit board.  Suppl. Swaroop Decl., Ex. 36 ("Munson Tr.") at 50:14-
4   16.  [Doc. # 227-15] ("I would not expect to see sidewalls attached to a circuit board").

5   At his September 30, 2014 deposition, Dr. Feland explained that a person of
6   ordinary skill in the art would have understood that the type of circuit board referred to as
7   a "back plane" at that time was a large connector generally used in PCs that could not
8   logically wrap around a mobile device.  Declaration of Paul A. Stewart in Opposition to
9   Motion for Partial Summary Judgment to Fifth Amended Complaint ("Stewart Opp.
10  Decl."), Ex. 32 ("Feland Tr") at 175:23-176:5.  [Doc. # 182-32.]  Dr. Feland stated that
11  the term "back plane" *could* validly apply to a circuit board, but that he disagreed that it
12  did so in this case.  Feland Tr. at 173:7-11.

13  Defendants' expert, Dr. Munson, states in his declaration that the term "back
14  plane" has the ordinary meaning of "a circuit board containing sockets into which other
15  circuit boards or components can be plugged in."  Munson Decl. at ¶ 34.  He asserts that
16  "[t]his meaning would have been understood by a person of ordinary skill in the art in
17  January 2009."  *Id*.  It is also the meaning to which mophie's expert, Dr. Nunally,
18  subscribed in his submission to the PTO, and this was reaffirmed by mophie's patent
19  attorneys during the patent prosecution.  *Id*.  According to Dr. Munson, given the two
20  conflicting definitions of "back plane" in the '351 prosecution history, "[o]ne skilled in
21  the art of the subject matter . . . could not reasonably be expected to determine how to
22  choose between them."  *Id*. at ¶ 45.

### III.

### LEGAL STANDARD

26  Summary judgment should be granted "if the movant shows that there is no
27  genuine dispute as to any material fact and the movant is entitled to judgment as a matter
28  of law."  Fed. R. Civ. P. 56(a); *accord Munoz v. Mabus*, 630 F.3d 856, 860 (9th Cir.

2010).  Material facts are those that may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e) (1986)); *see also Norse v. City Of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial.").  "[T]he inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## IV.

## DISCUSSION

mophie moves for summary judgment as to the trademark, copyright, and patent infringement claims against both Source Vista against LivingSocial.  Memorandum of Points and Authorities in Support of Mophie's Motion for Summary Judgment of Trademark, Copyright, and Patent Infringement ("mophie MSJ") at 3, 25.  [Doc. # 133.] LivingSocial moves for summary judgment as to all claims against it.  Memorandum of Points and Authorities in Support of Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment ("LivingSocial MSJ") at 25. [Doc. # 131.]  Source Vista moves for summary judgment as to ownership of a valid copyright and patent infringement.  Defendants' Memorandum in Support of Motion for Partial Summary

Judgment ("Source Vista MSJ") at 24.  [Doc. # 156.]  mophie also moves for bifurcation of Defendants' affirmative defense and counterclaim for unenforceability of the '235 Patent.  Motion to Bifurcate Defendants' Inequitable Conduct *See* Declaration of David Munson in Support of Defendants' Motion for Partial Summary Judgment ("Munson Decl.") at ¶¶ 35-42.   [Doc. # 154.].   Defense and Counterclaim ("mophie mot. to bifurcate"). [Doc. # 160.]  The Court addresses each of these motions below.

## A.    Copyright Infringement

In order to establish copyright infringement, a plaintiff must show:  (1) ownership of a valid copyright; and (2) that the defendant violated the copyright owner's exclusive rights under the Copyright Act.  *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1159 (9th Cir. 2007).   Copyright holders have the exclusive right to reproduce or distribute their copyrighted works.  Source Vista has moved for summary judgment as to the validity of mophie's copyrights, and both mophie and LivingSocial have moved for summary judgment as to the copyright infringement claim.

### 1.    Validity of the Copyrights

A copyright registration is *prima facie* evidence of the copyright and the facts stated in the certificate.  *United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir. 2011).  It is undisputed that mophie holds a registered copyright for the product packaging and user manuals for its juice pack products.  Source Vista contends that the registration creates only a rebuttable presumption, and that mophie's copyrights do not possess the requisite creativity and originality necessary to obtain valid copyright protection.  Source Vista MSJ Opp. at 8-10.

Courts have noted that "the requisite level of creativity is extremely low; even a slight amount will suffice." *Melchizedek v. Holt*, 792 F. Supp. 2d 1042, 1050 (D. Ariz. 2011) (originality of copyright requires only a "minimal degree of creativity"); *see also Kim Seng Co. v. J & A Importers, Inc.*, 810 F. Supp. 2d 1046, 1053 (C.D. Cal. 2011) ("the amount of creative input by the author to meet the originality standard is low.")

-22-

Source Vista cites to *Bibbero Sys., Inc. v. Colwell Sys., Inc.*, in which the Ninth Circuit found that a "superbill" form which included some "simple instructions to the patient on how to file an insurance claim using the form, such as 'complete upper portion of this form'" was not copyrightable.  893 F.2d 1104, 1106 (9th Cir. 1990).

Here, mophie's copyrighted user manual amounts to more than "simple instructions."  The user manual does not simply describe the product in dry, functional terms, but uses exhortations such as:  "You will now be able to travel great distances:  be the master of your own destiny, no longer bound by the limitations of your iPhone internal battery.  Let's get Juiced!" and "Don't be afraid to top it off!"  Source Vista GDMF at ¶¶ B(7), (13); LivingSocial GDMF at ¶¶ 18, 24 (phrases which Source Vista copies wholesale in its own user manual).  This language goes beyond obvious instructions for the use of the product and rises to the minimal level of creativity required for a valid copyright.

Similarly, mophie's product packaging meets the "minimal degree of creativity" required for copyrightable material.  The choice of font, colors, and arrangement of graphic elements all require some level of creative input from a designer.  As mophie points out, "[i]t is well established that an artistic packaging design or label is entitled to copyright protection."  *Parfums Givenchy, Inc. v. C&C Beauty Sales, Inc.*, 832 F. Supp. 1378, 1391 (C.D. Cal. 1993).

Source Vista's motion for summary judgment as to mophie's ownership of a valid copyright is **DENIED**.

### 2.    Copyright Infringement:  Copying

mophie contends that Defendants violated its exclusive right of reproduction by copying its user manuals and packaging.  Copying may be established by showing that defendants (1) had access to the work, and (2) the two works are "substantially similar" in idea and expression.  *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000).  In the alternative, copying can be established by showing that the accused design

-23-

is so "strikingly similar" to the copyrighted work that no explanation other than copying is plausible. *Id*. at 485.

Defendants indisputably had access to mophie's product packaging and user manuals based on the wide dissemination of the products throughout the United States. Source Vista's product packaging and user manual are not only "substantially similar," but so "strikingly similar" to mophie's copyrighted works that no reasonable jury could find that these materials were independently created. Both the packaging and the user manuals are nearly identical to a degree that cannot be a coincidence.

The Court therefore **GRANTS** mophie's motion for summary judgment as to Source Vista's infringement of its right of reproduction of its copyrighted materials. mophie's motion for summary judgment against LivingSocial on the copying claim is **DENIED** because there is no evidence in the record that the latter reproduced any of the copyrighted materials.

### 3.    Copyright Infringement: Distribution

mophie contends that LivingSocial distributed copies of its copyrighted work by sale or other transfer of ownership.   mophie MSJ Reply at 23; 17 U.S.C. § 106(3). Infringement of the distribution right requires an "actual dissemination" of copies of the work.  *See Perfect 10 v. Amazon.com, Inc.*, 487 F.3d 701, 718 (9th Cir. 2007).  "The scope of the term distribution is only defined within § 106(3) itself, as a 'sale or other transfer of ownership' or a 'rental, lease, or lending' of a copy of the work. The plain meaning of that section requires an identifiable copy of the work to change hands in one of the prescribed ways for there to be a distribution."  *Atl. Recording Corp. v. Howell*, 554 F. Supp. 2d 976, 985 (D. Ariz. 2008).

LivingSocial did not directly sell or distribute the infringing goods.  LivingSocial never took custody of Source Vista's charger cases, never took title to the cases, and never shipped any of the cases.  mophie GDMF at ¶ 33.  LivingSocial cannot have transferred ownership to customers or caused the infringing products to change hands

-24-

when it never owned, possessed, or took title to them in the first place.

Because LivingSocial did not distribute any copyrighted material, the Court **GRANTS** LivingSocial's motion for summary judgment as to direct infringement of the distribution right of the copyrighted materials.

### 4.    LivingSocial's Secondary Copyright Liability

mophie has alleged that LivingSocial is liable for contributory and vicarious copyright liability.   "Although the lines between direct infringement, contributory infringement, and vicarious liability are not clearly drawn, in general, contributory liability is based on the defendant's failure to stop its own actions which facilitate third-party infringement, while vicarious liability is based on the defendant's failure to cause a third party to stop its directly infringing activities." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d at 1175.

### a.  Contributory Copyright Liability

"Liability for contributory copyright infringement attaches when one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1169 (C.D. Cal. 2002).  "[L]iability exists if the defendant engages in personal conduct that encourages or assists the infringement." *Id.* at 1169.  There is no evidence that LivingSocial induced or caused the infringing activity.  The remaining inquiry is whether it materially contributed to the infringing conduct with knowledge of the infringement.

"The standard for the knowledge requirement is objective, and is satisfied where the defendant knows or has reason to know of the infringing activity." *Id.*.  "Willful blindness" can establish the knowledge element for contributory liability. *Ludvarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1073 (9th Cir. 2013).  In order to allege willful blindness, a plaintiff must allege that the defendant "(1) subjectively believed that infringement was likely occurring on their networks and that they (2) took deliberate

actions to avoid learning about the infringement." *Id*. "To require that the corporation is aware of the asserted patent is to say that certain of the corporation's employees have knowledge of that patent. In the context of willful infringement, it is safe to say that the employees required to have knowledge of the asserted patent must have some connection to the decision willfully to infringe." *Potter Voice Technologies, LLC v. Apple Inc.*, No. C 13-1710 CW, 2014 WL 46768, at *2 (N.D. Cal. Jan. 6, 2014).

In the June 26, 2013 merchant service agreement between Source Vista and Living Social, Source Vista represented that its products did not infringe or misappropriate any "copyright, trademark, right of publicity, moral right, trade secret, or other proprietary right." LivingSocial SAMF at ¶ 5. LivingSocial did not conduct any additional investigation into any intellectual property rights associated with mophie's juice pack cases or otherwise ask Source Vista whether it had conducted any investigation of any intellectual property rights associated with mophie's juice pack cases. mophie GDMF (LS) at ¶¶ 89-90.

Between March and June of 2013, LivingSocial explored the possibility of putting together a Deal with mophie. *See* Wytsma Decl., Ex. 13. The emails exchanged did not address issues of intellectual property, or the existence of any trademarks, copyrights, or patents. *Id*. During those negotiations, LivingSocial senior counsel Elizabeth Hinkle reviewed documents from mophie that included an Approved Retailer Agreement that included a mention of the "mophie juice pack" trademark. Hinkle Decl. at ¶ 3; Wytsma Decl., Ex. 13. Hinkle states that she did not review the Agreement closely, because it was clear that it was in conflict with LivingSocial's standard merchant agreement, and she was not aware of the trademarks, patents, or copyrights at issue in this case. Hinkle Decl. at ¶ 7. Hinkle did not discuss the terms of the Agreement with anyone else at LivingSocial. *Id*. at ¶ 5.

Some LivingSocial employees were tracking competitor activity, including a Groupon sale of a mophie juice pack, in July of 2013. Mophie AMF at ¶ 53; Stewart

-26-

Decl., Ex. 21.  [Doc. # 277.]  The spreadsheet does not make any reference to intellectual property rights.  *Id.*  The spreadsheet includes over fifty other Deals on the same page as the mophie juice pack entry.  *Id.*  One of these employees inspected the packaging of a Source Vista "juice pack plus" in anticipation of the LivingSocial/Source Vista Deal, but passed it on to another employee for quality testing.  Stewart Decl., Ex. 28 ("DiPietro Tr.") at 76:8-20.

LivingSocial stopped promoting Source Vista's charging case on its website at 9:33 a.m. on August 30, 2013, the day after being served with mophie's complaint alleging infringement.  LivingSocial AMF at ¶ 39.  LivingSocial processed the payment for three vouchers for the infringing product after it received notice of the alleged infringement on August 30, 2013.  Stewart Opp. Decl., Ex. 44.  LivingSocial continued to issue refunds to customers after August 30, 2013.  Stewart Opp. Decl., Ex. 30.

No one at LivingSocial who was involved with the Source Vista promotion knew or should have known about mophie's copyrights, trademarks, or patents before it was served with mophie's lawsuit.  Source Vista made a representation to LivingSocial that its product was non-infringing, and LivingSocial did not investigate further.  This does not amount to the subjective suspicion that infringement is occurring and deliberate actions to avoid learning of that infringement that amount to "willful blindness" for purposes of contributory infringement.

None of the emails between mophie and LivingSocial from March to June of 2013 indicate that any employee at LivingSocial was made aware of mophie's trademarks, copyrights, or patents.  Hinkle has stated that she did not closely read the Agreement mentioning mophie's trademark, deleted and discarded the Agreement because it conflicted with LivingSocial's policies, did not discuss the contract terms with anyone else at LivingSocial, and was not aware of any of mophie's intellectual property rights until the time that this lawsuit was filed.  Hinkle was not involved with or aware of the Source Vista deal.

-27-

The fact that LivingSocial employees tracking competitor deals may have been aware of the existence of the mophie juice pack products does not indicate that any of them were aware of mophie's intellectual property rights.  There is no evidence that they had actual knowledge of its trademark, patents, or copyrights.

LivingSocial did not have knowledge of the infringement until August 29, 2013, when it was served with this lawsuit.  LivingSocial removed the Deal from its website the next day at 9:33 a.m.   After that date, LivingSocial processed payment for three additional voucher purchases which were already in the system and issued a number of refunds to customers who had purchased vouchers.

The refunds cannot be construed as "materially contributing" to the infringement. LivingSocial merely followed through on its commitments to customers who had already obtained the infringing product and wanted a refund, and did not encourage or assist in the purchase of any additional infringing products.  By issuing refunds, LivingSocial prevented further infringement by preventing those vouchers from being used on infringing products.

Because the Deal was taken down on August 30, the payments processed after that date were necessarily for voucher purchases made before the Deal was taken down. Although the processing of payment for these three vouchers may have allowed three more customers to potentially acquire the infringing product, three potential instances of purchases made before LivingSocial became aware of mophie's lawsuit do not amount to more than a *de minimis* contribution in a case where 40,000 products were sold.  Wytsma Decl., Ex. 19 ("Bocan Tr.") at 54:6-10 (40,000 people bought the product) [Doc. # 146-19.];  *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451, 104 S. Ct. 774, 793, 78 L. Ed. 2d 574 (1984) (application of the legal maxim *de minimis non curat lex* may be appropriate where the owner of the protected material "suffers no substantial harm."); *Witco Chem. Co. v. Whitfield Chem. Co.*, 418 F.2d 1403, 1405 (C.C.P.A. 1969) ("We are not concerned with . . .  *de minimis* situations but with the practicalities of the

-28-

commercial world, with which the trademark laws deal.").

LivingSocial did not materially contribute to the infringement after it had knowledge of the infringement.  Accordingly, the Court **GRANTS** LivingSocial's motion for summary judgment as to contributory copyright liability.

### b. Vicarious Copyright Liability

"In the context of copyright law, vicarious liability extends beyond an employer/employee relationship to cases in which a defendant has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1022 (9th Cir. 2001), *as amended* (Apr. 3, 2001), *aff'd sub nom. A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091 (9th Cir. 2002) (internal citation and quotation marks omitted).  "[A] plaintiff must establish that the defendant exercises the requisite control over the direct infringer and that the defendant derives a direct financial benefit from the direct infringement."  *Perfect 10, Inc.,* 508 F.3d at 1173.  It is indisputable that LivingSocial derived a direct financial benefit from Source Vista's infringement by profiting from the sale of the vouchers for the phone cases.  The salient question is whether LivingSocial had the legal right and the practical ability to control the direct infringement.

"[A] defendant exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so."  *Id.*; *see also Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262 (9th Cir. 1996) (defendant landlord had "the right to terminate vendors for any reason whatsoever and through that right had the ability to control the activities of vendors on the premises . . . and promoted the swap meet and controlled the access of customers to the swap meet area.").

Where "[d]efendants could likely take certain steps that may have the indirect effect of reducing infringing activity on the Internet at large" but did not have "any ability to directly control th[e infringing] activity," defendants are not vicariously liable."

-29-

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 803 (9th Cir. 2007); *see also Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d at 1173-74 (Google's agreement, which gave it the right to monitor and terminate partnerships with entities that violate others' copyrights, did not give it the right to stop direct infringement by third parties where a third party was able to continue to distribute its infringing copies after its participation in the agreement had ended).

LivingSocial's merchant agreement states that "LivingSocial may cancel the deal specified in the order form or any subsequent insertion order in its discretion upon notice to merchant at any time prior to the offer period for a particular deal." Stewart Opp. Decl., Ex. 1 ("Shah Tr.") at 180:14-18 [Doc. # 182-1.]. LivingSocial controlled the amount of voucher codes that were available. *Id*. at 180:14-18. LivingSocial determined the expiration date of the deal. *Id*. at 109:11-18. LivingSocial provided refunds for its vouchers. *Id*. at 168:16-18.

Source Vista did not sell any of the infringing cases outside of its promotion with LivingSocial. *Id*. at 118:5-14. Source Vista depended on deal sites like LivingSocial to provide it with accountings of its own sales activities. *Id*. at 162:15-168:1.

LivingSocial clearly had the ability to control and supervise the terms of the promotion itself. While Source Vista may have made all of its sales through LivingSocial, and depended on deal sites to provide it with accountings, LivingSocial had no legal or practical right to stop Source Vista from making and selling the infringing product in other venues. As with Google in *Perfect 10 v. Amazon*, LivingSocial's Agreement, which gave it the right to monitor and terminate partnerships with entities that violate others' copyrights, did not give it the right to stop direct infringement by Source Vista. Source Vista was able to continue to distribute its infringing copies after its participation in the agreement had ended if it wished to do so, even if it had not previously sold its products through any other medium. The Ninth Circuit has stated that "the mere ability to withdraw a financial 'carrot' does not create the 'stick' of 'right and

ability to control' that vicarious infringement requires." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d at 803.  Here, LivingSocial had the legal and practical ability to stop Source Vista from selling its infringing product on its site (as it did after receiving notice of the infringement), but nothing about their relationship gave LivingSocial the right to control whether and where Source Vista otherwise sold its products.

Accordingly, the Court **GRANTS** LivingSocial's motion for summary judgment as to mophie's claim for vicarious copyright infringement.

## B.    Trademark Infringement

Any party that "uses" the trademark of another in connection with the sale, offering for sale, or distribution of goods is liable for trademark infringement.  15 U.S.C. § 1114(1).  To establish patent infringement, a plaintiff must prove (1) that it has a valid, protectable trademark; and (2) that the defendants' use of the trademark is likely to cause customer confusion.  *Applied Info. Sciences Corp. v. eBAY, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007).  mophie alleges infringement of its registered "Juice Pack" marks, as well as its unregistered "4:11 Lock Screen" and "Circular Pattern" marks by both Source Vista and LivingSocial.  FAC at ¶¶ 13-15.

### 1.    Validity of the Mark

"The threshold issue in any action for trademark infringement is whether the words used by a manufacturer in connection with [its] product are entitled to protection."  *Id*. at 969.  A plaintiff can establish this in one of three ways:  (1) show that it has a federally registered mark; (2) show that its mark is descriptive but has acquired a secondary meaning in the market; or (3) show that it has a suggestive mark, which is inherently distinctive and protectable.  *Id*.  Registration of a mark with the PTO constitutes prima face evidence of the validity of the registered mark and the registrants' exclusive right to use the mark on the goods and services specified in the registration."  *Id*. at 970; 15 U.S.C. §§ 1057(b), 1115(a).

Trademarks placed on the Federal Register attain a presumption of validity after

-31-

five years, and this presumption prevents cancellation challenges on the grounds that a trademark is descriptive and lacks secondary meaning. *Aureflam Corp. v. Pho Hoa Phat I, Inc.*, 375 F. Supp. 2d 950, 952 (N.D. Cal. 2005).  Even before five years have passed, however, "[f]ederal registration of a trademark endows it with a strong presumption of validity."  *Coca–Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1254 (9th Cir.1982).

### a.  Registered Juice Pack Plus Mark

mophie owns a federal registration for its juice pack plus trademark.  LivingSocial GDMF at ¶ 1; Source Vista GDMF at ¶ 1.  Source Vista does not dispute that mophie possesses a registration document for the juice pack plus, but contends that "the exhibit does not prove 'ownership' of the mark" and "[f]urther, the mark is contestable as the registration document is less than [five] years old."  Source Vista GDMF at ¶ 1

A defendant may rebut the presumption of validity where a trademark is contestable.  *Vuitton et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 755 (9th Cir.1981).  If a mark is merely "descriptive" it must possess secondary meaning to rise to the level of a valid and protectable trademark.  *Americana Trading, Inc., v. Russ Berrie & Co.*, 966 F.2d 1284, 1287 (9th Cir.1992).  "Secondary meaning refers to a mark's actual ability to trigger in consumers' minds a link between a product or service and the source of that product or service.  That is, a mark has secondary meaning when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself."  *Grupo Gigante SA De CV v. Dallo & Co., Inc.*, 391 F.3d 1088, 1095–96 (9th Cir. 2004) (internal citation marks and quotations omitted).

In 2011, a PTO examiner found the "juice pack" mark to be descriptive and denied mophie's trademark application.  Sherman Decl.  at ¶ 4; Ex. A.  mophie was later able to overcome that determination and was granted a registered mark for "juice pack plus" without being required by the PTO to submit evidence of secondary meaning.  *Id.*; Suppl. Swaroop Decl., Ex. 33.  Neither of the PTO's determinations are binding on this Court, but are entitled to respectful consideration.  *Lahoti v. Vericheck*, 636 F.3d 501, 506 n.1

-32-

1   (9th Cir. 2011); *Carefree Trading, Inc. v. Life Corp.*, 83 F. Supp. 2d 1111, 1114 (D. Ariz.
2   2000) *vacated and remanded on other grounds*, 19 F. App'x 841 (Fed. Cir. 2001)
3   (judicial review of decisions from the Patent Office less deferential than "clearly
4   erroneous" standard); *Calmese v. McNamer*, No. 3:13-CV-01042-HU, 2014 WL
5   1796680, at *2 (D. Or. May 6, 2014) ("Generally, decisions of the PTO are not binding
6   on the Court, but are entitled to consideration by the Court.") (internal citations and
7   quotation marks omitted).

8        A PTO examiner's initial determination that the juice pack mark is descriptive
9   does not overcome the presumption that it is a valid and protectable mark based on the
10  current registration.  On its face, the term "juice pack plus" does not obviously apply to a
11  smartphone battery charger.  It is at the very least more suggestive than descriptive of
12  mophie's product.  *See Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141-42 (9th
13  Cir. 2002) ("A suggestive mark is one for which a consumer must use imagination or any
14  type of multistage reasoning to understand the mark's significance . . . the mark does not
15  describe the product's features, but suggests them.") (internal citations and quotation
16  marks omitted).  While one of the several Merriam-Webster definitions for "juice" is "a
17  medium (as electricity or gasoline) that supplies power," it requires several more logical
18  steps to imagine that a "juice pack" is a battery charger for a phone, and not, for example,
19  a box of fruit juice.  *See* http://www.merriam-webster.com/dictionary/juice (last visited
20  November 4, 2014).

21       Even if the juice pack plus mark were considered descriptive, descriptive
22  trademarks are valid as long as they have acquired secondary meaning.  *Zobmondo
23  Entm't LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010).  The issuance of
24  mophie's registration for the juice pack plus mark without a requirement of evidence of
25  secondary meaning creates a presumption of secondary meaning.  *Americana Trading
26  Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1287 (9th Cir. 1992).

27       Moreover, mophie has produced evidence that its mark has in fact acquired

-33-

secondary meaning.  "Evidence of sales, advertising and promotional activities may be relevant in determining whether [a mark] has acquired a secondary meaning."  *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir. 1987) (internal citation and quotation marks omitted); *see also E. & J. Gallo Winery v. Pasatiempos Gallo, S.A.*, 905 F. Supp. 1403, 1415 (E.D. Cal. 1994) (evidence of sales, advertising and promotion used to evaluate secondary meaning of trademark).  "[T]he test of secondary meaning is the effectiveness of the effort to create it."  *First Brands* at 1383.

The mophie juice pack cases are the number one selling battery cases in North America, and have ████ of the U.S. battery market.  Bocan Decl. at ¶¶ 16, 19.  mophie has spent many millions of dollars promoting its juice pack family of battery cases.  Declaration of Paul A. Stewart in Opposition to Defendants' Motion for Summary Judgment, Ex. 10 (Doherty Tr.) at 351:2-7.  The mophie juice pack cases are available in almost all major consumer electronics retails stores and websites for these stores.  *Id.* at ¶ 20.  mophie has received awards for its juice pack products, and the products have been featured in well-known publications like *USA Today*, the *Wall Street Journal*, the *Los Angeles Times*, *People* Magazine, and *Entrepreneur* Magazine.  Doherty Tr. at 353:11, Exs. 11-12.  These facts are uncontroverted.

The PTO registration creates a strong presumption that mophie's mark is protectable.  The mark is not merely descriptive on its face and, in any case, the mark has acquired secondary meaning.[14]  The "juice pack plus" trademark is valid and protectable.

_____

[14] Although an Internet search for terms is certainly not a definitive determination of secondary meaning, it may be probative of the association between a trademarked word or phrase and a product in the minds of the masses.  *See, e.g.*, Lisa Larrimore Ouellette, *The Google Shortcut to Trademark Law*, 102 California Law Review 351 (2014) (various studies show that a Google search is often probative of the strength and distinctiveness of a trademarked word or phrase).  Every single result for at least the first eight pages of a Google search for "juice pack plus" relates to mophie products.  *See* https://www.google.com/search?q=juice+pack+plus (last visited November 12, 2014).  The first result

-34-

### b. Unregistered Marks

mophie also asserts infringement of its unregistered "4:11 Lock Screen" and "Circular Pattern" marks.  FAC at ¶¶ 13-15.

According to mophie, it has consistently used those images on its packaging and products since launching the juice pack products in 2008, and the vast majority of sales of those products have included the Tuesday November 11 date on their packaging.  mophie GDMF (SV) at ¶¶ 76-77.  Source Vista asserts that mophie has used other dates on its packaging, including March 13 and December 31.  *Id.* at ¶ 32.  mophie disputes this fact, stating that "mophie has consistently used the Tuesday November 11 date."  *Id.* Regardless of which date has been used, the 4:11 time has always been used, and always been the most dominant portion of the trademark.  *Id.*  The 4:11 Lock Screen and Circular Pattern are prominently displayed on mophie's social media sites and in numerous magazines featuring mophie and its products such as *People*, *Oprah*, *Money*, and *Network World*.  Bocan Decl. ¶¶ 8, 18; Ex. 26.

LivingSocial contends that both unregistered marks are "functional."  *See Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1005 (9th Cir. 1998) (plaintiffs must demonstrate that the mark is "nonfunctional" to recover for trademark infringement).  LivingSocial also asserts that neither mark is "distinctive."  LivingSocial MSJ at 5.  *See Zobmondo*, 602 F.3d  at 1113 ("To be valid and protectable, a mark must be "distinctive.'").

There are genuine disputes of material fact about whether the unregistered marks are functional, have been used consistently, and have acquired a secondary meaning. Whether or not the "4:11 Lock Screen" and the "Circular Pattern" are valid and

---

that does not directly display mophie products is a result for "How to spot a fake Mophie Juice Pack Plus for iPhone 4/4S."

protectable marks is a question of fact that cannot be resolved at the summary judgment stage on the current record.

mophie's motion for summary judgment as to infringement of the unregistered trademarks is therefore **DENIED**.

## 2.   Likelihood of Confusion

Once a plaintiff has established a protectable mark, it must establish a likelihood of confusion between the infringing product and the original product.   *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999).   The Ninth Circuit had adopted the following factors, known as the *Sleekcraft* test, to evaluate whether a defendant's use of a trademark is likely to confuse consumers:

> (1) the strength of the mark; (2) proximity or relatedness of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) the degree of care customers are likely to exercise in purchasing the goods; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion into other markets.

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 608-09 (9th Cir. 2005) (citing *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979)). The Court need not address all of the factors, and a plaintiff need not establish that each factor weighs in its favor in order to establish a likelihood of confusion.   *One Indus., LLC v. Jim O'Neal Distrib.*, Inc., 578 F.3d 1154, 1162 (9th Cir. 2009); *Glow Indus., Inc. v. Lopez*, 273 F. Supp. 2d 1095, 1117 (C.D. Cal. 2003).

### a.  Similarity of the Mark

As reflected in the photograph, *supra*, showing the mophie packaging and the Source Global packaging side-by-side, the packaging of the two juice pack products is essentially identical.  In particular, the Source Vista packaging uses the words "juice pack plus" in the same font and in the same place as they appear on mophie's packaging.  The only difference between the packaging for the two products is that Source Vista's does

-36-

not include the word "mophie."

### b.  Proximity or Relatedness of Goods

When goods are related, "the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." *Sleekcraft*, 599 F.2d at 350.  Both products are smartphone cases with a built-in battery.  They serve the same function and have essentially the same design.  The nearly identical nature of the goods points towards a likelihood of confusion.

### c.  Actual Confusion

Evidence of actual confusion is not necessary to show a likelihood of confusion. *Century 21 Real State Corp. v. Sandline*, 846 F.2d 1175, 1178 (9th Cir. 1988).  Evidence of actual confusion does, however, add weight towards the conclusion that actual confusion is likely.  *Glow Indus.,* 273 F. Supp. 2d at 1117.  A LivingSocial executive stated in his deposition that there had been "a dozen or so" cases in which it appeared that consumers were confused about whether the Source Vista phone case they received was a mophie product.  Swaroop Decl., Ex. 9, Phalen Tr. at 135:8-21.  This evidence of actual confusion weighs in favor of a finding of likelihood of confusion.[15]

### d.  Marketing Channels

mophie has provided evidence that it relies on online forums and websites to promote its juice pack products.  mophie SUF at ¶ 5; Bocan Decl. at ¶ 4.  It is undisputed that Source Vista sold its product through LivingSocial, an online forum and website. Source Vista Resp. SUF at ¶ A(30).  The two products are sold through similar marketing

---

[15] mophie has produced five witnesses who have stated in declarations that they were confused as to the source of the battery cases they bought from LivingSocial.  *See*, *supra*, note 7. Source Vista asserts that mophie did not properly disclose the names of the allegedly confused customers during the discovery period.  The declarations will not be admitted per Rule 37(c).  In any case, the Court finds that there is adequate evidence of likelihood of confusion without this additional evidence.

-37-

channels.  This factor also tips towards a likelihood of confusion.

### e.  Other *Sleekcraft* Factors

All of the preceding factors weigh significantly in favor of a likelihood of consumer confusion.  The remaining factors are strength of the mark, degree of care customers are likely to use in purchasing the goods, the defendant's intent in selecting the mark, and the likelihood of expansion into other markets.  As discussed above regarding the validity of the trademark, there is evidence that mophie's mark has acquired some secondary meaning, and is relatively strong.  There is insufficient evidence currently in the record to evaluate degree of care, defendant's intent, and likelihood of expansion.

Even without evaluating these remaining, less heavily-weighted *Sleekcraft* factors, the evidence is sufficient to determine that there is no genuine dispute of material fact as to likelihood of confusion between the two products.

### f.  Source Vista Has Infringed mophie's Trademark

mophie owns a valid and protectable trademark, and there is a likelihood of confusion between the two juice pack products.  The Court finds that there are no triable issues of fact as to Source Vista's infringement of mophie's registered mark.

### 3.  Statutory Notice of Registered Trademarks

A defendant must have actual notice of a registered trademark before profits and damages can be recovered.  15 U.S.C. § 1111; *Coach, Inc. v. Asia Pac. Trading Co.*, 676 F. Supp. 2d 914, 925 (C.D. Cal. 2009) ("[Section] 1111 simply states that no profits and damages shall be recovered under the provisions of this Act unless statutory or actual notice was given.") (internal citation and quotation marks omitted).  A registrant "may give notice that his mark is registered by displaying with the mark the words 'Registered in U.S. Patent and Trademark Office' or "Reg. U.S. Pat & Tm. Off." or the letter R enclosed within a circle."  15 U.S.C. § 1111.

As demonstrated by various exhibits showing mophie products, mophie did, in fact, display the letter R enclosed within a circle next to its "juice pack plus" trademark

-38-

on its products.  *See, e.g.*, Declaration of Laura A. Wytsma in Support of Motion for Summary Judgment as to Fifth Amended Complaint ("Wytsma Decl."), Ex. 15 at 16-17 and Ex. 21 at 4-5, 7 [Doc. # 146-15, 146-21.]  The Wytsma Declaration does not specify when these products were on the market.  *See* Wytsma Decl.

LivingSocial argues that, because mophie only points to notice of its mark in user manuals or on the label of the product itself, mophie is tacitly acknowledging that it did not mark its product packaging with the required notice.  LivingSocial MSJ Reply at 21.  LivingSocial argues that because these markings were "not visible to the public before the time of purchase" they do not provide "constructive knowledge of [the] registered trademarks to the public at large."  *Id.*

Source Vista argues that "[t]he Plaintiff's 30(b)(6) witness testified that in 2013, the year in which the alleged infringements took place, Plaintiff's marks did not bear the requisite indications of 'Registered,' 'Reg.' or even ® put the public, and especially Defendants, on constructive notice of the trademarks."  Source Vista MSJ at 19.  Source Vista does not provide a citation or other evidentiary support for this alleged admission by the Plaintiff's Rule 30(b)(6) witness.[16]  *Id.*

There is no authority supporting the contention that mophie was required to provide notice to the "public at large" of its registered trademark before the time of purchase, or ever.  The question is whether *Defendants* had notice of the registered mark.

A defendant has some duty to investigate whether or not it is infringing another's

---

[16]  Exhibit 22 to the Wytsma Declaration is a transcript of Daniel Huang, one of mophie's 30(b)(6) witnesses.  Wytsma Decl., Ex. 22 ("Huang Tr.") [Doc. # 241-3.]  In this transcript, Huang discusses the visibility of the patent number and copyright mark on a mophie Juice Pack Plus phone case, but does not discuss trademarks at all.  Huang Tr. at 245: 12-24.  Exhibit 23 to the Wytsma Declaration is a transcript of Shawn L. Dougherty, also a Rule 30(b)(6) witness for mophie.  Wytsma Decl., Ex. 23 ("Dougherty Tr.") [Doc. # 241-4.]  Dougherty also does not discuss the presence or absence of a trademark indication on the mophie products.  Dougherty Tr. at 283: 11-16.

-39-

trademark if it has reason to suspect that it may be.  *Coach Services, Inc. v. YNM, Inc.*, 2011 WL 1752091 at *5 (C.D. Cal., May 6, 2011) ("willfulness can be established by evidence . . . that the defendant willfully blinded himself to facts that would put him on notice that he was infringing another's trademarks, having cause to suspect it"); *Philip Morris USA Inc. v. Liu*, 489 F. Supp. 2d 1119, 1123 (C.D.Cal.2007) ("Willfulness can be established by evidence of knowing conduct or by evidence that the defendant acted with an aura of indifference to plaintiff's rights—in other words, that the defendant willfully blinded himself to facts that would put him on notice that he was infringing another's trademarks, having cause to suspect it.") (internal quotation marks and citation omitted).

There is evidence that mophie included the ® mark next to its "juice pack plus" trademark on the product itself, although it is not clear during which time period the mark appeared.  Given the abundant evidence of Source Vista's blatant copying of mophie's packaging and manual, it is reasonable to surmise that Source Vista had access to mophie's product—not just its external product packaging—and should have seen the ® next to the trademark.  At the very least, Source Vista should have suspected that it was infringing the trademark and at best "willfully blinded [itself] to facts that would put [it] on notice that [it] was infringing another's trademark."  *Coach Services* at *5.

The existence of actual notice is a question of fact.  *Admiral Corp. v. Sewing Mach. Sales Corp.*, 156 F. Supp. 796, 798 (S.D.N.Y. 1957).  Here, there are disputed material facts regarding the timing of mophie's affixation of the ® mark on the product or packaging such that Source Vista's actual notice of mophie's registered trademark may not be resolved at the summary judgment stage.

In any case, section 1111 is not a defense to infringement, but a limitation on remedies.  *United States v. Sung*, 51 F.3d 92, 94 (7th Cir. 1995) ("Omission of the ® symbol and lack of knowledge combined do not foreclose equitable remedies . . . and therefore cannot be called a 'defense' under the Lanham Act.").  Therefore, this Court may (and does) find as a matter of law that Source Vista has infringed mophie's

trademark, and reserves the question of actual notice for the calculation of damages.

mophie's motion for summary judgment is **GRANTED** as to Source Vista's infringement of mophie's registered Juice Pack mark.

### 4.     Living Social's Direct Trademark Liability

None of mophie's claimed marks appeared anywhere on LivingSocial's website in connection with the Source Vista chargers deal.  LivingSocial AMF at ¶ 8; FAC, Ex. 21. *See Site Pro-1, Inc. v. Better Metal*, LLC, 506 F. Supp. 2d 123, 127-128 (E.D.N.Y. 2007) (online search engine did not "use" protected marks where it did not display them but could potentially direct users to third-party page with infringing marks); *see also Bally Total Fitness Holding Corp. v. Faber*, 29 F. Supp. 2d 1161, 1168 (C.D. Cal. 1998) ("Including linked sites as grounds for finding commercial use or dilution would extend the statute far beyond its intended purpose.").  Source Vista, not LivingSocial, owned, held title to, and shipped the infringing products to customers.  mophie AMF at ¶ 50. LivingSocial did not "use" mophie's claimed marks in any part of its promotion or processing of the Deal for the Source Vista chargers, and so cannot be liable for direct trademark infringement. *See* 15 U.S.C. § 1114(1).

LivingSocial's motion for summary judgment is **GRANTED** as to the direct trademark infringement claim.

### 5.     LivingSocial's Secondary Trademark Liability

As the Ninth Circuit has noted, "[t]he tests for secondary trademark infringement are even more difficult to satisfy than those required to find secondary copyright infringement." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d at 806.

#### a.  Contributory Trademark Infringement

"To be liable for contributory trademark infringement, a defendant must have (1) intentionally induced the primary infringer to infringe, or (2) continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied. *Id.* at 807.  When the allegation is that a party "continue[d]

-41-

to supply its *services* to one whom it knows or has reason to know is engaging in trademark infringement" the plaintiff must additionally show "direct control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark" in order to establish contributory liability.  *Id*. 807 (emphasis added); *see also Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir.1999) (the relevant inquiry is "the extent of control exercised by the defendant over the third party's means of infringement").

It is undisputed that LivingSocial did not intentionally induce Source Vista to infringe.  Instead, the issue is whether LivingSocial continued to supply its services to Source Vista after it knew or had reason to know that Source Vista was engaging in trademark infringement, and whether LivingSocial had direct control and monitoring of the instrumentality used by Source Vista to infringe.  As discussed above, LivingSocial effectively ceased to provide its services to Source Vista once it knew or had reason to know of the infringement and took down the promotion from its website.  The few instances involving the subsequent processing of payments or issuing of refunds were services rendered to the customers who had purchased vouchers, not to Source Vista.  As discussed above, LivingSocial did not have direct control over Source Vista's means of infringement.

Accordingly, the Court **GRANTS** LivingSocial's motion for summary judgment as to the claim for contributory trademark infringement.

### b.  Vicarious Trademark Liability

Vicarious liability for trademark infringement requires "a finding that the defendant and the infringer have an apparent or actual partnership, have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product."  *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d at 807.

There is no evidence whatsoever of an agreement between LivingSocial and Source Vista that would give either the authority to bind one another in transactions with

-42-

third parties beyond the parameters of the specific contractual agreement regarding the limited promotion at issue.   As discussed above, LivingSocial never took title or possession of the infringing products, and so did not exercise joint ownership or control over them.

The Court therefore **GRANTS** LivingSocial's motion for summary judgment as to vicarious trademark infringement.

### C.     Trademark Dilution

mophie's third claim is for trademark dilution under 15 U.S.C. § 1125(c).  FAC at 20.  LivingSocial moves for summary judgment as to trademark dilution.  "In order to prove [trademark dilution], a plaintiff must show that (1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment."  *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir. 2008).

"Dilution is the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of—(1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception."  *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1011 (9th Cir. 2004).  "[I]t is a cause of action reserved for a select class of marks—those marks with such powerful consumer associations that even non-competing uses can impinge on their value.  For this reason, the [statute] extends dilution protection only to those whose mark is a 'household name.'"  *Nissan Motor Co.* at 1011.

While there is evidence that mophie's trademark has been heavily advertised, has strong sales, and has been written up in the mainstream media, there is not enough evidence that the mark rises to the level of the kind of "household name" with the scope of actual recognition required for a mark to be considered famous as a matter of law.  *See Jada Toys, Inc.,* 518 F.3d at 635.  This is a question of fact that cannot be resolved at the

summary judgment stage.

Only LivingSocial has moved for summary judgment on the trademark dilution claim. Liability for trademark dilution requires that "the defendant is making use of the mark in commerce." 15 U.S.C. § 1125(c)(1). As discussed above, LivingSocial is not "making use" of mophie's mark, and therefore LivingSocial cannot be liable for trademark dilution. LivingSocial's motion for summary judgment as to trademark dilution is therefore **GRANTED** on that basis alone.

### D.    Trade Dress Infringement

mophie has brought a claim for trade dress infringement of its MOPHIE FLAP BOX trade dress under 15 U.S.C. § 1125(a). FAC at ¶¶ 105-110. Only LivingSocial has moved for summary judgment as to this claim.

A plaintiff seeking to recover for trade dress infringement must show that its trade dress is protectable and that defendant's use of the same or similar trade dress is likely to confuse consumers. *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 841 (9th Cir. 1987). LivingSocial's promotion for the Source Vista phone case does not show any packaging for the product, of the FLAP BOX variety or otherwise. *See* FAC, Ex. 21. LivingSocial did not "use" mophie's trade dress, and thus cannot be liable for infringement. Living Social's motion for summary judgment is **GRANTED** as to trade dress infringement.

### E.    Patent Infringement

Source Vista argues that the proper construction of the term "back plane" in the context of the '235 patent claims is "a circuit board containing sockets into which other circuit boards can plug in." Source Vista MSJ Opp. at 13. mophie argues that the proper construction of "back plane" is "a flat surface located on the back side of the device." mophie MSJ Reply at 11. This is the crux of the dispute between the parties regarding the meaning of the '235 Patent.

### 1.     Legal Standard

It is a "bedrock principle" of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).   The court looks to "the words of the claims themselves . . . to define the scope of the patented invention."  *Id.* (ellipsis in original) (internal citation and quotation marks omitted).   "[T]he words of a claim are generally given their ordinary and customary meaning."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal citation and quotation marks omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  *Id.* at 1313.

Regarding the interpretation of claim language, the Federal Circuit has stated:

> In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.  In such circumstances, general purpose dictionaries may be helpful.  In many cases that give rise to litigation, however, determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art.  Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.  Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

*Id.* at 1314 (internal citations and quotation marks omitted).

Construing a patent is a question of law, to be determined by the court.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384, 116 S. Ct. 1384, 1393, 134 L. Ed. 2d

577 (1996).  "[M]atters of claim construction, even those aided by expert testimony, are questions for the court." *Id*. at 387.

"As a general rule, courts should construe terms used in the same patent or family of patents consistently." *FCI USA, Inc. v. Hon Hai Precision Indutry, Co.*, No. C-03-4519 JCS, 2005 WL 6219892, at *2 (N.D. Cal. Jan. 12, 2005).  A word or phrase used in the same patent or patent family should be interpreted consistently "unless there is reason to believe the word or phrase was intended to have a different meaning in different contexts." *Fortinet, Inc. v. Palo Alto Networks, Inc.*, 753 F. Supp. 2d 1024, 1030 (N.D. Cal. 2010); *see also Epcon Gas Sys. Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1031 (Fed. Cir. 2002) ("a word or phrase used consistently throughout a claim should be interpreted consistently").

"[C]ourts also should consider the patent's prosecution history, which can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution." *Conceptus, Inc. v. Hologic, Inc.*, 771 F. Supp. 2d 1164, 1172 (N.D. Cal. 2010); *see also Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1374 (Fed. Cir. 2014) ("In addition to consulting the specification, we may also consider the prosecution history and any relevant extrinsic evidence.").

Moreover, "the prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application." *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004); *see also Laitram Corp. v. Morehouse Indus., Inc.*, 143 F.3d 1456, 1460 n. 2 (Fed.Cir.1998) (applying the prosecution histories of two sibling patents, which shared a common written description, to one another).  "Any statement of the patentee in the prosecution of a related application as to the scope of the invention [is] relevant to claim construction, and the relevance of the statement made . . . is enhanced by the fact that it [is] made in an official proceeding in which the patentee [has] every incentive to exercise

care in characterizing the scope of its invention." *Microsoft,* 357 F.3d at 1350.

### 2.    Meaning of Claim Language

The Court first examines the plain meaning of the words themselves.  Claim 1 of the '235 Patent describes "a back plane upon which the back of a housing of the mobile device will be placed against, where the back plane comprises a top edge."  A "back plane" is described in several of the '235 claims.

At first blush, from an ordinary meaning perspective, mophie's simple definition of the words "back plane" as a flat surface on the back side of the mobile device has surface appeal.  Indeed, Merriam Webster defines "back" as "the side or surface of something that is opposite the front or face:  the rear side or surface of something." http://www.merriam-webster.com/dictionary/back (Last visited November 4, 2014).  It defines "plane" (noun) as "a flat or level surface."  http://www.merriam-webster.com/dictionary/plane (Last visited November 3, 2014).  Further investigation reveals, however, that a backplane is defined in the *McGraw-Hill Dictionary of Scientific and Technical Terms* as "a wiring board, usually constructed as a printed circuit . . . to provide the required connections between logic, memory, input/output modules, and other printed circuit boards."  Nunally Decl. at ¶ 35.  Thus, the dictionary definitions of the words do not provide a single unambiguous ordinary and customary meaning of the term "back plane."  Therefore, the Court must look to additional evidence of how the term would have been understood by one skilled in the relevant art in January 2009.

The parties' experts are in complete disagreement as to what "back plane" means in this context.[17]  mophie's expert, Dr. Feland, asserts that construing the term "back

---

[17] All three experts are qualified to be considered persons of ordinary skill in the art to which the patents pertain.  *See* Feland Report, Munson Decl., and Nunally Decl. for experience, education, and qualifications.

plane" to mean "a circuit board" or "a circuit board containing sockets into which other circuit boards can be plugged in" makes no sense in light of the claims and the specification.  Feland Report at ¶ 48.  Defendants' expert, Dr. Munson, does not disagree in the abstract.  Munson Tr. at 50:14-16 ("I would not expect to see sidewalls attached to a circuit board").  Where he parts company with Dr. Feland is regarding the meaning of "back plane" to a person of ordinary skill in the art in light of the prosecution history pertinent here.  Significantly, the '351 App. shares identical specifications and drawings with the '235 patent because the '351 application was filed from the same application that became the '235 patent.  *See* Munson Decl. at ¶ 25.  [Doc. # 154.]

The problem is that both sides' respective "ordinary meaning" definitions of "back plane" find support in the dictionaries.  Moreover, the prosecution history shows that mophie has used the same terminology to describe *both* contexts.  *See* Munson Decl. at ¶¶ 34, 45 (given the two conflicting definitions of "back plane" in the '351 prosecution history, "[o]ne skilled in the art of the subject matter . . . could not reasonably be expected to determine how to choose between them.").

As noted above, the Federal Circuit has stated that "the prosecution history regarding a claim term is pertinent when interpreting the same term in both later issued and earlier-issued patents in the same family."  *Capital Mach. Co. v. Miller Veneers, Inc.*, 524 Fed. Appx. 644, 649 (Fed Cir. 2013).  The '351 App. is a divisional of the '235 Patent, and both derive from the '897 App.  mophie GDMF (SV) at ¶¶ 8-10.

The claimed invention in the '351 Application relates to a battery pack for a mobile device.  Nunally Decl. at ¶ 18.  Claim 21 of the '351 App is for:

> A *battery pack for a mobile device* comprising: (i) a bottom section comprising: (1) *a back plane upon which a back of a housing of the mobile device will be placed against*, wherein the back plane comprises a top edge; (2) a battery cell, enclosed in the bottom section; (3) a processor, coupled to the battery cell; (4) *a bottom sidewall, connected to the back plane* at an end opposite of the top edge, that will be positioned against a bottom

side edge of the mobile device…

*Id.* (emphasis added).

In support of this patent, in 2012, the Nunally Declaration states that "[t]he term back plane was known to one skilled in the art specifically in November of 2007, to be 'a circuit board containing sockets into which other circuit boards can be plugged in.'" Nunally Decl. at ¶ 35.  In response to the Nunally Declaration, the Examiner issued a Detailed Action on October 17, 2011, stating that "[i]n regards to the element of a 'circuit board' it has been noted that there is full support for the element of a circuit board to the earliest filing date."  McPherson Decl., Ex. C ("Detailed Action") at ¶ 3.

On November 20, 2013, Dr. Feland submitted a declaration relating to the '351 App., in connection with patent interference proceedings, stating that the term "back plane" should be given the meaning of a flat surface located on the back side of the device.  *Id.* at ¶ 49.  A person skilled in the art reviewing the '351 file history would find two different definitions of "back plane" in the expert declarations.  *Id.*

By stating that a person of ordinary skill in the relevant art would define "back plane" as a circuit board in the context of the '351 Patent, the Nunally Declaration directly contradicts Dr. Feland's claims that it would "make no sense" to connect a bottom sidewall to a circuit board or to place the back of a mobile device against a circuit board.  Both of those descriptions are found in the '351 Patent.  The Nunally Declaration also contradicts the argument that a back plane would not be construed as a circuit board in the context of a patent directed at a small device used to receive a mobile.  The '351 Patent is also directed at such a device.   Dr. Feland's assertion that the Nunally Declaration refers to a "back plane" in the "electrical" context rather than the "mechanical" context of the '235 Patent falls flat given that the prosecution history of these patents is so interrelated.  mophie cannot have it both ways.  There is no coherent single definition of "back plane" that can square with the evidence in the record.

### 3.     Indefiniteness under 35 U.S.C. § 112

The Supreme Court has recently stated that "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, _____ U.S. _____, 134 S. Ct. 2120, 2124, 189 L. Ed. 2d 37 (2014).   As Dr. Munson aptly stated regarding the conflicting expert reports:   one skilled in the relevant art could not reasonably be expected to determine how to choose between them.   Given the fact that the '235 Patent is in the same family as the '351 Patent, and no reasonable explanation has been offered for why the definition of "back plane" would not be the same in both contexts, the Court finds that the '235 Patent is invalid for indefiniteness under 35 U.S.C. § 112.

For the foregoing reasons, the Court **GRANTS** Source Vista's and LivingSocial's motions for summary judgment as to patent infringement.

### F.     Federal Unfair Competition and False Designation of Origin, California Common Law Trademark Infringement, and California Unfair Competition.

mophie has also brought claims against LivingSocial and Source Vista for federal unfair competition and false designation of origin pursuant to 15 U.S.C. § 1125(a), common law trademark infringement, and unfair competition pursuant to Cal. Bus. & Prof. Code § 17200 *et seq.*  FAC at ¶¶ 69-70, 88-89, 117-18.   Only LivingSocial has moved for summary judgment as to these claims.

Each of these claims is predicated on the underlying allegations of direct infringement of mophie's copyrights and trademarks. *See* FAC at ¶¶ 69-70, 88-89, 117-18; *see also Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999) ("the analysis under [trademark infringement and unfair competition] is oftentimes identical."); *New W. Corp. v. NYM Co. of California*, 595 F.2d 1194, 1201 (9th Cir. 1979) ("Whether we call the violation infringement, unfair competition or false

-50-

designation of origin, the test is identical."). Consistent with the preceding analysis, the Court finds that there is no evidence to support a claim that LivingSocial has committed any type of infringement, and so these remaining derivative unfair competition and state law claims cannot survive.

The Court **GRANTS** LivingSocial's motion for summary judgment as to the claims for federal unfair competition and false designation of origin, common law trademark infringement, and unfair competition.

### G.     Bifurcation of the Inequitable Conduct Claim is Justified

LivingSocial and Source Vista have alleged that the '235 Patent is unenforceable due to inequitable conduct before the PTO as a cross-claim and affirmative defense to the patent infringement claims. LivingSocial Answer to Mophie's Fifth Amended Complaint at 13 (Twelfth Affirmative Defense); Shah and Serve Global's Answer to Mophie's Fifth Amended Complaint at 26-31 (Third Counterclaim). [Doc. ## 158, 159.] mophie requests bifurcation of this issue on the grounds that it would present prejudicial, complicated, confusing and irrelevant issues to the jury.

Because the Court has found that the '235 Patent is invalid for indefiniteness, the request for bifurcation is **DENIED** as moot.


# V.

## CONCLUSION

In light of the foregoing:

1. LivingSocial's motion for summary judgment is **GRANTED** in its entirety;

2. mophie's motion for summary judgment is **GRANTED** as to trademark infringement and copyright infringement by Source Vista, **DENIED** as to patent infringement, and **DENIED** as to all other claims against LivingSocial;

3. Source Vista's motion for partial summary judgment is **DENIED** as to copyright ownership and **GRANTED** as to patent infringement; and

4. Given that this Order quotes from numerous documents which have been filed under seal, the Order is filed under seal. Within five days from the date of this Order, the parties will meet and confer regarding which portions of this Order, if any, they propose to be redacted such that the Court may issue a redacted version of the Order. The parties shall file a joint report with the Court by no later than November 17, 2014 regarding the proposed redacted version of the Order.

**IT IS SO ORDERED.**

DATED: November 12, 2014

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE